Nicholas Transier (CA SBN_265211)
Email: ntransier@pattersonsheridan.com
**Patterson + Sheridan LLP**
4660 La Jolla Village Drive, Suite 200
San Diego, CA 92121
Telephone: (619) 340-0370
Fax: (713) 623-4846

Jerry Selinger (TX SBN 18008250)(admitted *pro hac vice*)
Email: JSelinger@pattersonsheridan.com
**Patterson + Sheridan LLP**
1700 Pacific Avenue, Suite 2650
Dallas, TX 75201
Telephone: (214) 720-2200

James L. Williams (AZ SBN 026402) (admitted *pro hac vice*)
**SCHMITT SCHNECK**
**CASEY EVEN & WILLIAMS, P.C.**
1221 E Osborn Rd. #105
Phoenix, AZ 85014
Telephone: (602) 277-7000
james@azbarristers.com

Counsel for Plaintiff and Counter-Defendant
EVOLVE TECHNOLOGIES, LLC

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Evolve Technologies, LLC**, a Delaware limited-liability company,<br><br>        Plaintiff,<br><br>v.<br><br>**Coil Winding Specialist, Inc.**, a California corporation,<br><br>        Defendant. | Case No. 3:18-cv-00671-BEN-BGS<br><br><br>**PLAINTIFF/COUNTER DEFENDANT EVOLVE TECHNOLOGIES, LLC'S OPENING CLAIM CONSTRUCTION BRIEF PURSUANT TO PATENT LOCAL RULE 4.4(A)** |
| **Coil Winding Specialist, Inc.**, a California corporation,<br><br>        Counter Claimant,<br><br>v.<br><br>**Evolve Technologies, LLC**, a Delaware limited liability company,<br><br>        Counter Defendant. | |

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 1

II.  THE ASSERTED PATENTS .............................................................................. 1

III.  LEGAL STANDARD .......................................................................................... 4

IV.  ARGUMENT ...................................................................................................... 7

    a.  "hydraulic dampening means for dampening the movement of the piston" – '417 Patent, claim 10 ................................................................................ 7

    b.  "means to set the override assembly in the second position" – '693 Patent, claim 1 ... 9

    c.  "means to automatically set the override assembly to the second position" – '693 Patent, claim 3 ................................................................................ 10

    d.  "flow control assembly" / "flow control member" – '417 Patent, claims 1, 25, 26, 27; '693 Patent, claim 1; '655 Patent, claim 5; '629 Patent, claim 1; '042 Patent, claim 1 ................................................................................................. 12

    e.  "temperature sensor" – '417 Patent, claims 1, 22, 25, 26, 27; '693 Patent, claim 1; '655 Patent, claim 5; '629 Patent, claim 1; '042 Patent, claim 1 ................................ 15

    f.  "operative engagement" – '417 Patent, claim 1; '693 Patent, claim 1 ...................... 16

    g.  "override assembly" / "override member" – '417 Patent, claims 1, 9; '693 Patent, claims 1, 9; '655 Patent, claim 6 ................................................................. 18

    h.  "slide control assembly" – '417 Patent, claim 22 ...................................................... 21

V.  CONCLUSION .................................................................................................. 22

# TABLE OF AUTHORITIES

### CASES

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
   314 F.3d 1313 (Fed. Cir. 2003).............................................................................. 11

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
   448 F.3d 1324 (Fed. Cir. 2006)................................................................................ 6

*B. Braun Med., Inc. v. Abbott Labs.*,
   124 F.3d 1419 (Fed. Cir. 1997)................................................................................ 6

*Baran v. Med Device Techs., Inc.*,
   519 F. Supp. 2d 698 (N.D. Ohio 2007);............................................................... 7, 8

*Bicon, Inc. v. Straumann Co.*,
   441 F.3d 945 (Fed. Cir. 2006)......................................................................... 6, 8, 20

*Callicrate v. Wadsworth Mfg.*,
   427 F.3d 1361 (Fed. Cir. 2005)................................................................................ 7

*Cannon Rubber Ltd. v. First Years Inc.*,
   2004 U.S. Dist. LEXIS 18836 (N.D. Ill. Sep. 16, 2004) ......................................... 7

*Cannon Rubber Ltd. v. First Years, Inc.*,
   163 Fed. App'x 870 (Fed. Cir. 2005)........................................................................ 7

*Chamberlain Grp., Inc. v. Lear Corp.*,
   516 F.3d 1331 (Fed. Cir. 2008)............................................................................. 4, 5

*Cybor Corp. v. FAS Techs.*,
   138 F.3d 1448 (Fed. Cir. 1998) (en banc)................................................................ 4

*Ecolab Inc. v. Paraclipse, Inc.*,
   285 F.3d 1362 (Fed. Cir. 2002).............................................................................. 11

*Golight, Inc. v. Wal-Mart Stores, Inc.*,
   355 F.3d 1327 (Fed. Cir. 2004)..................................................................... 14, 20, 22

*In re Swinehart*,
   439 F.2d 210 (C.C.P.A. 1971) .............................................................................. 15

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004)........................................................................ 5, 6, 13

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004).................................................................................... 6

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967, 979 (Fed. Cir. 1995).............................................................................. 5

*Micro Chem., Inc. v. Great Plains Chem. Co.*,
   194 F.3d 1250 (Fed. Cir. 1999).................................................................................. 7

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003)........................................................................ 6, 20, 22

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc)........................................................... passim

*U.S. Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997)................................................................... 4, 14, 20, 22

*Ventana Med. Sys. v. BioGenex Labs., Inc.*,
   473 F.3d 1173 (Fed. Cir. 2006)..................................................................... 14, 20, 22

*Versa Corp. v. Ag-Bag Int'l Ltd.*,
   392 F.3d 1325 (Fed. Cir. 2004).................................................................................. 7

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996).................................................................................... 5

*Wenger Mfg. v. Coating Machinery Sys.*,
   239 F.3d 1225 (Fed. Cir. 2001).................................................................................. 6

STATUTES

35 U.S.C. § 112, ¶ 6 ......................................................................................... 1, 6, 9

This is the Opening Claim Construction Brief of Plaintiff/Counter Defendant Evolve Technologies, LLC pursuant to Patent Local Rule 4.4(a).

## I.   INTRODUCTION

Evolve proposes constructions of three "means-plus-function" terms. *See infra* §§ IV.a-c. The parties agree the three terms are construed under § 112, ¶ 6, and generally agree about the recited functions. However, the parties disagree about the corresponding structure in the specification linked to the recited functions. Defendant Coil Winding Specialist, Inc. ("CWS") seeks to include additional structure beyond what the specification discloses as necessary and links to the recited functions and seeks to avoid a statutory requirement.

Evolve believes the remaining terms have plain and ordinary meanings and do not require further construction. By contrast, CWS proposes constructions that improperly import language from the specification, or replace an unambiguous claim term with an ambiguous alternative word. Evolve thus proposes alternative constructions for those terms if the Court determines any construction is appropriate.

## II.   THE ASSERTED PATENTS

Evolve asserts five related patents against CWS: U.S. Patent Nos. 7,878,417 ("'417 Patent) (Ex. A), 8,434,693 ("'693 Patent) (Ex. B), 9,309,655 ("'655 Patent) (Ex. C), 9,611,629 ("'629 Patent) (Ex. D), and 9,927,042 ("'042 Patent) (Ex. E).[1] The patents relate to a restrictive valve, addressing a problem that commonly occurs when an individual turns on, for example, a shower to let the water warm up but leaves the shower running unattended. This can lead to significant waste of water and heating costs as warm water runs down the drain. *See, e.g.*, '417 Patent at 1:25-39. A valve described in the patents pauses or restricts water flow when the water reaches an

---

[1] These patents share a common description and claim priority to U.S. Patent No. 7,681,804, which describes a valve assembly with the same or similar functionality described herein.

appropriate temperature and then permits a user to reactivate the water flow. *See, e.g.*, *id.* at 1:58-66.

By way of example, Figures 1A, 2A, 3A of the '417 Patent depict structure providing this functionality. As shown in Figures 1A and 2A, annotated below, an increase in water temperature above a predetermined level causes actuator 822 to expand, moving piston 814 to the right in slide 808 to shut off fluid flow. *See, e.g.*, *id.* at 3:66-4:5, 6:38-42.



FIGURE 1A

18-cv-00671-BEN-BGS



FIGURE 2A

To resume water flow, release pin 830 is withdrawn from the slide head 808B, which allows slide 808 to move downstream (to the right in the figure below) due to the upstream water pressure, as shown in annotated Figure 3A below. *See, e.g.*, *id.* at 4:13-24.



FIGURE 3A

Turning off the water flow allows slide spring 806 to move slide 808 upstream, permitting release pin 830 to move back to the position of Figure 1A. *See, e.g.*, *id.* at 4:27-36. As the actuator 822 cools and contracts, piston spring 812 moves piston 814 back to the position of Figure 1A. *See, e.g.*, *id.* at 4:8-9.

The patents-in-suit generally claim valves or flow control systems. The various patents claim different details of valves and flow control systems described in the patents-in-suit to protect novel aspects of the embodiments described in the specification.

### III.   LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citation and internal quotations marks omitted). Determining the "scope and meaning of the patent claims asserted" is a task reserved for judges. *Cybor Corp. v. FAS Techs.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc). "Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).

"[T]he words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips*, 415 F.3d at 1312 (citations omitted). Courts make this determination from the perspective of a person of ordinary skill in the art at the time the patent is filed. *Chamberlain Grp., Inc. v. Lear Corp.*, 516 F.3d 1331, 1335 (Fed. Cir. 2008). "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313.

"In some cases, the ordinary meaning of claim language as understood by a

person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. Evolve believes that is the situation here. However, if the meaning of a claim term as understood by persons of skill in the art is not apparent, the Court can "look[] to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Id.* (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)). "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.* (quoting *Innova*, 381 F.3d at 1116).

Sources in the intrinsic record are preferred. *Chamberlain Grp.*, 516 F.3d at 1335. Often, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. But "claims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)). In fact, the specification is usually "dispositive," as "it is the single best guide to the meaning of a disputed term." *Id.* (internal quotation marks omitted). Finally, the court should consider the patent's prosecution history, which is the record of proceedings before the Patent and Trademark Office ("PTO") and includes prior art cited during the patent examination. *Id.* at 1317. Caution is warranted here, however. "[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

If the intrinsic evidence resolves the ambiguity in the disputed claim terms, then "it is improper to rely on extrinsic evidence." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). If ambiguities in the claim terms remain,

however, courts may consider extrinsic evidence. *Id.* at 1584. Extrinsic evidence includes expert testimony, inventor testimony, dictionaries, and scientific treatises. *Phillips*, 415 F.3d at 1317.

"[C]laims are interpreted with an eye toward giving effect to all terms in the claim." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) (citation omitted). "[W]hen an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms." *Innova/Pure Water*, 381 F.3d at 1120. A court "presume[s], unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) (citation omitted).

"Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004).

The parties agree that three terms are governed by 35 U.S.C. § 112, ¶ 6. "Claim construction of a means-plus-function limitation includes two steps. First, the court must determine the claimed function. Second, the court must identify the corresponding structure in the written description of the patent that performs that function." *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1332 (Fed. Cir. 2006) (citations omitted). "[S]tructure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). "Under § 112, ¶ 6, a court may not import functional limitations that are not recited in the claim, or structural limitations from the written description that are unnecessary to perform the claimed function." *Wenger Mfg. v. Coating Machinery Sys.*, 239 F.3d 1225, 1233 (Fed. Cir.

2001) (citing *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). Prefatory language preceding "means" can inform the function that the means must perform. *See Baran v. Med Device Techs., Inc.*, 519 F. Supp. 2d 698, 716–18 (N.D. Ohio 2007); *see also Cannon Rubber Ltd. v. First Years Inc.*, 2004 U.S. Dist. LEXIS 18836, at *9–16 (N.D. Ill. Sep. 16, 2004) ("Even where, as here, clearly functional language follows the word 'for,' the prefatory claim language preceding the word 'means' serves to at least partially identify the function of the recited means.) *vacated-in-part on other grounds by Cannon Rubber Ltd. v. First Years, Inc.*, 163 Fed. App'x 870 (Fed. Cir. 2005).

The corresponding structure must "[a]ccount[] for all structure in the specification corresponding to the claimed function" *Callicrate v. Wadsworth Mfg.*, 427 F.3d 1361, 1369 (Fed. Cir. 2005). "[W]hen multiple embodiments in the specification correspond to the claimed function, proper application of § 112, P6 generally reads the claim element to embrace each of those embodiments." *Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1329 (Fed. Cir. 2004) (quoting *Micro Chem.*, 194 F.3d at 1258.

## IV.   ARGUMENT

### a.   *"hydraulic dampening means for dampening the movement of the piston" – '417 Patent, claim 10*

| Evolve's Construction | CWS's Construction |
|---|---|
| Recited Function: "hydraulically dampening the movement of the piston." <br> Structure in Specification Linked to Recited Function: Channel 814E or 814F in piston head 814A, with or without gland O-ring 710, and equivalents thereof. | Function: "dampening the movement of the piston" <br> Structure: "O-ring 710 against the actuator nose combined with the two small channels 814E and 814F provides a 'piston pump' hydraulic action to help prevent by dampening to potential hammering." |

The parties disagree on (i) whether the function includes the word "hydraulically", (ii) whether the O-ring 710 is necessary structure linked to the recited function, and (iii) whether the literal construction includes "equivalents thereof."

First, the claim term reads "hydraulic dampening means for dampening." The "hydraulic" term preceding "means" informs the recited function. *See Baran*, 519 F. Supp. 2d at 716–18. Failing to include "hydraulically" in the defined function, as CWS proposes, would have the effect of eliminating "hydraulic" from the claim. This would not be a proper result since "claims are interpreted with an eye toward giving effect to all terms in the claim." *See Bicon, Inc.*, 441 F.3d at 950.

Second, the specification does not link the O-ring 710 as necessary structure to the recited function. The specification states:

> FIG. 5B illustrates an embodiment of piston 814 with two small channels 814E and 814F in piston head 814A that will allow water to trickle through the valve even when it is in an off position. This . . . acts as a hydraulic dampener to prevent "hammering."

'417 Patent at 5:40-45. Hence, the specification clearly links the small channels 814E and 814F as the structure for hydraulic dampening. This passage is the only instance in the specification that specifically describes hydraulic dampening. Further, the prosecution history of the '417 Patent bolsters this passage. The patentee stated:

> Claim 28 recites a valve having a flow control assembly including a secondary channel configured to allow a trickle of water to flow . . . . The claimed invention allows the trickle of water to help prevent cross-flow on worn mixing valves and *acts as a hydraulic dampener* to prevent "hammering", as discussed in the Specification in at least paragraph [0038] and *shown in Figure 5B as channels 814E and 814F*.

Ex. F at 130-131 (Amendment dated 9/3/2010 at 13-14) (emphasis added).

The specification describes the O-ring 710 as contributing more generally to dampening, but does not indicate that the O-ring 710 is necessary for hydraulic

dampening. The specification describes the O-ring 710 as providing a "drag" that "will provide dampening." '417 Patent at 4:66-5:3. The specification further states, "[T]he effect of gland O-ring 710 against the actuator nose combined with the two small channels 814E and 814F provides a 'piston pump' hydraulic action to help prevent by dampening [*sic*] potential hammering." *Id.* at 5:48-51. Hence, the O-ring 710 may provide additional dampening by the "drag" that assists and complements, but is not necessary to, the hydraulic dampening of the channels 814E and 814F. The O-ring 710 is not necessary structure linked in the specification to the recited function, but may be present to assist the hydraulic dampening.

Third, the statute mandates that the construction includes both the corresponding structure "and equivalents thereof." *See* 35 U.S.C. § 112, ¶ 6. Accordingly, the Court should include the statutory phrase in the construction of each of the three limitations subject to construction under § 112, ¶ 6.

### b.   "means to set the override assembly in the second position" – '693 Patent, claim 1

| Evolve's Construction | CWS's Construction |
|---|---|
| Recited Function: "setting the override assembly in the second position." | |
| Structure in Specification Linked to Recited Function: Release pin 830, release pin spring 832, and slide head 808B, and equivalents thereof. | Structure: Handle screw 836, handle 828, release pin 830, pin cylinder cap 700, having cap threaded area 700A, release pin housing 802B, body rear 802, cam pin 831, hole 830D in release pin arm 830A, cam 706, release pin housing 802B, boss 706A, arm 830A, curved portion 706B of cam 706, release pin spring 832, slide head 808B, and release pin land 830B. |

The parties disagree on (i) the necessary structure linked to the agreed recited function and (ii) whether the literal construction includes "equivalents thereof." Evolve here also relies on the statutory language for including "equivalents thereof" in

9                                    18-cv-00671-BEN-BGS

the literal construction of the corresponding structure.

The specification links only the slide head 808B, release pin 830, and release pin spring 832 to the agreed recited function. The specification states:

> When slide head 808B abuts shoulder 820A, release pin 830 under the impetus of release pin spring 832 will move to the lockout position as illustrated in FIGS. 1A and 1B, thus automatically resetting the override to a pre-override position.

'693 Patent at 4:30-34. In the specification, the setting (*e.g.*, resetting) of the override returns the override to be disengaged or locked out by the pre-override position of Figure 1A, *see, e.g.*, *id.* at 4:30-32, 3:60-64, after being engaged as described with respect to Figures 3A and 3B, *see id.* at 4:23-25. In the claim, the "second position" of the override assembly "enabl[es] the temperature sensor and piston assembly to control the flow of water through the main body." *See id.* at 7:55-58. The "pre-override position" of Figure 1A is the "second position" of the claim in the described embodiment. This "pre-override position" enables the temperature sensor and actuator 822 and piston 814 to control the flow of water through the body front 820 and body rear 802. More particularly, in this "pre-override position," the piston 814, which is driven by the temperature sensor and actuator 822, can move within the slide 808 to shut off fluid flow through slide ports 808E in the slide 808. *See id.* at 3:60-4:3.

As shown in the quoted passage of the specification, the slide head 808B, release pin 830, and release pin spring 832 are the only structure specifically linked to setting (or resetting) the override assembly in a position for enabling a temperature sensor and piston assembly to control a flow of water like in the pre-override position described in the specification.

Accordingly, the linked necessary structure in the specification is the slide head 808B, release pin 830, and release pin spring 832.

### c. *"means to automatically set the override assembly to the second position" – '693 Patent, claim 3*

| Evolve's Construction | CWS's Construction |
|---|---|
| Recited Function: "automatically setting the override assembly to the second position." | |
| Structure in Specification Linked to Recited Function: Release pin 830, release pin spring 832, slide head 808B, and slide spring 806, and equivalents thereof. | Structure: Handle screw 836, handle 828, release pin 830, pin cylinder cap 700, having cap threaded area 700A, release pin housing 802B, body rear 802, cam pin 831, hole 830D in release pin arm 830A, cam 706, release pin housing 802B, boss 706A, arm 830A, curved portion 706B of cam 706, release pin spring 832, slide head 808B, and release pin land 830B. |

The parties disagree on (i) the effect of "automatically" in the recited function and (ii) whether the literal construction includes "equivalents thereof." Evolve here also relies on the statutory language for the latter point.

Importantly, the "means to automatically set the override assembly to the second position" limitation in claim 3 depends from and adds further structure to the corresponding structure of the "means to set the override assembly" limitation. CWS, however, proposes identical corresponding structures for both claim terms. CWS seeks to render nugatory the additional functional and structural limitations added by the dependent claim, contrary to the doctrine of claim differentiation. *See, e.g.*, *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1326 (Fed. Cir. 2003) ("Our court has made clear that when a patent claim 'does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement.' . . . . There is a rebuttable presumption that different claims are of different scope."). That presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent claim and a dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim. *See Ecolab Inc. v. Paraclipse, Inc.*, 285 F.3d 1362, 1375 (Fed. Cir. 2002).

"Automatically" adds additional corresponding structure that must be given effect. In addition to the corresponding structure Evolve has identified above, the slide spring 806 is linked necessary structure for "automatically setting." To be automatically set, the slide spring 806 moves the slide 808 upstream so that the release pin 830 moves to the lockout position as described above. *See* '693 Patent at 4:25-34, 3:47-49, 5:33-36. Accordingly, the slide spring 806 is additional structure linked to the "automatically setting" function.

### d. *"flow control assembly" / "flow control member"[2]* – '417 Patent, claims 1, 25, 26, 27; '693 Patent, claim 1; '655 Patent, claim 5; '629 Patent, claim 1; '042 Patent, claim 1

| Evolve's Construction | CWS's Construction |
|---|---|
| No construction needed. Plain and ordinary meaning.<br><br>In the alternative, for "flow control assembly," "parts that are configured to collectively function to control fluid flow."<br><br>In the alternative, for "flow control member," "a part within the flow control assembly." | A set consisting of a piston that forms a seal with a sliding sleeve when pushed by a wax motor. |

"Flow control assembly" is found in the asserted claims of the '417 Patent and the '693 Patent without "flow control member." Both "flow control assembly" and "flow control member" are used together in each asserted claim of the '655, '629, and '042 Patents.

_____

[2] Evolve does not believe that grouping "flow control assembly" and "flow control member" for a single construction is appropriate, *see* Patent L.R. 4.2(a), since the terms are different. However, CWS asserts that because CWS proposes the same construction for the terms, the dispute involves a single term. *See* Ex. G at 134.

The terms "flow control assembly" and "flow control member" are clear, and no further construction is necessary.

Beginning with "flow control assembly," the claims of the '417 and '693 Patents define various structural components included in the "flow control assembly." Independent claim 1 of the '417 Patent, for example, defines "flow control assembly" as including a temperature sensor, a piston, and an override assembly. *See* '417 Patent at 7:52-53, 55-56. The dependent claims add additional components to the "flow control assembly," and other independent claims include slightly different components. *See id.* at 7:64-65, 8:10-11, 8:23-26, 10:9-11, 10:39-42, 46-47, 55-56. Claim 1 of the '693 Patent is similarly organized. *See* '693 Patent at 7:45-60.

In the '655 Patent (claim 5), '629 Patent (claim 1) and the '042 Patent (claim 1), the "flow control assembly" is recited as including a temperature sensor and a "flow control member." *See* '655 Patent at 8:43, 46; '629 Patent at 8:21, 24; '042 Patent at 8:22, 25. CWS's efforts to construe "flow control member" and "flow control assembly" to have the same meaning when one (the member) is a component of the other (assembly) conflict with basic rules of claim construction. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1120 (Fed. Cir. 2004) ("[W]hen an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms.").

Notably, moreover, none of the structure CWS seeks to include in the construction of "flow control assembly" and "flow control member" is claimed as a component of the "flow control assembly." Rather, CWS improperly seeks to import specific structure from the specification or engraft something into the construction not found in the specification at all (*i.e.*, "wax motor"). CWS seeks to construe the "flow control assembly" and "flow control member" by how they purportedly interact with unclaimed components rather than providing a construction for the meaning of "flow control assembly" or "flow control member." There is no legal basis supporting

1   CWS's claim construction positions, and its approach confirms the lack of need for
2   construction of either term.

3       In all events, Evolve submits there is nothing ambiguous about "flow control
4   assembly" or "flow control member." The terms have meanings that are common,
5   which are apparent to even a lay person. *See, e.g.*, *Phillips*, 415 F.3d 1303 ("In some
6   cases, the ordinary meaning of claim language as understood by a person of skill in
7   the art may be readily apparent even to lay judges."). Providing a further construction
8   would only result in "an obligatory exercise in redundancy," *see U.S. Surgical Corp.*,
9   103 F.3d at 1568, that will not help, and may confuse, the jury.

10      If, *arguendo*, the Court believes some clarification is needed, Evolve proposes,
11  for "flow control assembly," "parts that are configured to collectively function to
12  control fluid flow," and for "flow control member," "a part within the flow control
13  assembly." The specification indicates that an assembly is multiple parts or
14  components: "The valve assembly 18 is comprised of the following components" and
15  cites a list of components. *See* '417 Patent at 3:9-14; *see also id.* at 3:14-17. The
16  specification goes into great detail of how many parts, many of which are specifically
17  identified in various claims, are configured to control the flow of water, including
18  using the override. *See, e.g.*, *id.* at 3:62-4:42. Although the various parts described in
19  the specification illustrate what can form a flow control assembly, Evolve was not
20  required to claim all of those components. *See, e.g.*, *Golight, Inc. v. Wal-Mart Stores,*
21  *Inc.*, 355 F.3d 1327, 1331 (Fed. Cir. 2004) ("[P]atentees [are] not required to include
22  within each of their claims all of [the] advantages or features described as significant
23  or important in the written description."); *Ventana Med. Sys. v. BioGenex Labs., Inc.*,
24  473 F.3d 1173, 1181 (Fed. Cir. 2006) ("When the claim addresses only some of the
25  features disclosed in the specification, it is improper to limit the claim to other,
26  unclaimed features"). The specification is clear that the invention is not limited to
27  those parts. *See, e.g.*, '417 Patent at 7:32-40. If the Court determines any construction
28  is needed other than plain and ordinary meaning, the Court should construe "flow

control assembly" to be "parts that are configured to collectively function to control fluid flow."

Turning to "flow control member" the flow control member is one of two general components of "the flow control assembly." The flow control member is configured to perform certain functions, and Evolve was within its right to define the flow control member in this way. *See In re Swinehart*, 439 F.2d 210, 212 (C.C.P.A. 1971) ("In our view, there is nothing intrinsically wrong with the use of such a technique in drafting patent claims. Indeed we have even recognized in the past the practical necessity for the use of functional language."). Evolve submits that, to the extent a construction is necessary, the Court should construe "flow control member" to be "a part within the flow control assembly."

> ### e. "temperature sensor" – '417 Patent, claims 1, 22, 25, 26, 27; '693 Patent, claim 1; '655 Patent, claim 5; '629 Patent, claim 1; '042 Patent, claim 1

| Evolve's Construction | CWS's Construction |
|---|---|
| No construction needed. Plain and ordinary meaning.<br><br>In the alternative, "structure configured to sense temperature and respond to at least some temperature changes." | Any mechanism that has a change in state with a change in temperature, such as a wax motor as described in the patent specification or a temperature sensitive alloy. |

"Temperature sensor" is found in each asserted independent claim of the patents. The term is clear, and no further construction is necessary. The patents do not define the term to have any unusual or different meaning. This term has a common meaning apparent even to a lay person, and construing this term would only be an obligatory exercise in redundancy.

Here also, CWS improperly seeks to incorporate structure and functionality into an unambiguous term. Moreover, CWS's construction seeks to incorporate into the

construction as an example "a wax motor as described in the patent specification" when there is no mention of a wax motor in the specification. There is no reason to provide even accurate examples for construction of this simple term. Additionally, there is no basis for requiring a "change in state."

If, *arguendo*, the Court believes some clarification is needed, Evolve proposes "structure configured to sense temperature and respond to at least some temperature changes." The specification describes a "temperature sensor and actuator 822." *See* '417 Patent at 3:28-29. The specification states:

> Actuator 822 is, in one embodiment, a wax actuator adapted to respond
> by expanding in a range of approximately 90° F. to 110° F., . . . . Element
> 822 both senses temperature changes and responds, . . . .

*Id.* at 6:33-55. The specification provides additional examples of sensors, and the invention is not limited to any particular sensor. *See, e.g., id.* at 7:32-40.

The specification states that the temperature sensor (*e.g.*, temperature sensor and actuator 822) senses temperature. The specification also describes a response to temperature changes (*e.g.*, "a wax actuator adapted to respond by expanding"). The specification further indicates that the temperature sensor does not necessarily respond to all temperature changes but that the response may be to just some temperature changes (*e.g.*, "in a range of approximately 90° F. to 110° F."). If the Court determines any construction is needed other than plain and ordinary meaning, the Court should construe "temperature sensor" to be "structure configured to sense temperature and respond to at least some temperature changes."

### f. *"operative engagement"* – '417 Patent, claim 1; '693 Patent, claim 1

| Evolve's Construction | CWS's Construction |
|---|---|
| No construction needed. Plain and ordinary meaning.  In the alternative, "directly or indirectly connected to or contacting." | Having an effect on and interlocked to. |

"Operative engagement" is used in independent claims 1 of the '417 and '693 Patents.

As with previous terms, the term is clear, and no further construction is necessary. The claims recite, "a flow control assembly in operative engagement with the main body." '417 Patent at 7:51-52; '693 Patent at 7:45-46. The claims further outline this operative engagement between the flow control assembly and the main body. The flow control assembly includes a temperature sensor and piston that are "adapted to substantially block and unblock the flow of water in the channel [through the main body] responsive to the temperature sensor" and includes an override assembly moveable between positions to "enable the temperature sensor and piston to control the flow of water through the main body" and to "override the temperature sensor and piston and allow water to flow." *See* '417 Patent at 7:52-63; *see also* '693 Patent at 7:46-61. The patents do not define the term to have any unusual or different meaning.

CWS's proposal seeks to replace the claim term with ambiguous words (*e.g.*, "interlocked"), which, instead of resolving the meaning of "operative engagement," will likely create a further dispute over the meaning of the term.

Evolve submits that "operative engagement" is not ambiguous. This term has a common meaning apparent even to a lay person, and construing this term would only be an obligatory exercise in redundancy that will not help, and may confuse, the jury.

If, *arguendo*, the Court believes some clarification is needed, Evolve proposes "directly or indirectly connected to or contacting." Variations of "operative" and "engagement" are used throughout the claims and specification to illustrate the breadth of the term to include directly or indirectly connected to or contacting. In some instances, "engaged" is used to indicate contact. *Compare* '417 Patent at 8:23-24, 9:29-30 (a slide spring is "engaging the slide" and is "engaged with the body") *with id.* at Figs. 1A, 2A, 3A (the slide spring 806 contacts the body rear 802 and the slide head 808B of the slide 808); *compare id.* at 9:34 (a piston spring is "engaged

with the body") *with id.* at 3:42-45 (the piston spring 812 "abut[s] . . . at a second end spring retainer 802D [of the main body rear 802]"). In some instances, "engaged" is used to indicate direct connection. *Compare id.* at 9:28 (a temperature sensor is "engaged with the body") *with id.* at 3:53-55 (temperature sensor and actuator 822 has "threaded walls 822A for threaded engagement with threaded walls 820C of body front 820."). In another instance, the specification describes "direct mechanical engagement," *see id.* at 4:40, meaning "engagement" can be something other than "direct mechanical," namely an indirect connection. Accordingly, if the Court determines any construction is needed other than plain and ordinary meaning, the Court should construe "operative engagement" to be "directly or indirectly connected to or contacting."

### g. *"override assembly" / "override member"[3] – '417 Patent, claims 1, 9; '693 Patent, claims 1, 9; '655 Patent, claim 6*

| Evolve's Construction | CWS's Construction |
|---|---|
| No construction needed. Plain and ordinary meaning.<br><br>In the alternative, for "override assembly," "parts that are configured to collectively function to override."<br><br>In the alternative, for "override member," "a part that is configured to function, alone or in combination, to override." | An assembly that moves a release pin holding the flow-control assembly in place and consists of multiple parts. |

"Override assembly" is found in the claims of the '417 and '693 Patents, and "override member" is used in a single claim of the '655 Patent. The terms "override assembly" and "override member" are clear, and no further construction is necessary.

---

[3] Evolve objects to CWS's efforts to collapse "override assembly" and "override member" into a single construction. *See* Patent L.R. 4.2(a); *see also supra* n.2.

Beginning with "override assembly," respective independent claims 1 of the '417 and '693 Patents define the override assembly as being moveable between first and second positions, where one of the positions allows a temperature sensor and piston assembly to control a flow of water, and the other of the positions overrides or bypasses the temperature sensor and piston assembly to allow water to flow. *See* '693 Patent at 7:54-59; *see also* '417 Patent at 7:56-61. Dependent claims further claim various structural components that may be included in the "override assembly." The override assembly can include a handle, a slide, and a slide spring. *See, e.g.*, '417 Patent at 7:64-67, 8:10-11, 8:23-24. Further, the override assembly can include the structure of the "means to set" and "means to automatically set" the override assembly as detailed previously. *See* '693 Patent at 7:60-61, 65-67.

The "override member" in claim 6 of the '655 Patent is configured to allow water to flow regardless of the temperature of the water. *See* '655 Patent at 8:60-63. Independent claim 5 of the '655 Patent (from which claim 6 depends) claims that a flow control member is configured to substantially block a flow of water responsive to a temperature sensor. *See id.* at 8:46-48.

Notably, moreover, none of the structure or functionality CWS seeks to include in the construction of "override assembly" and "override member" is explicitly claimed for either the "override assembly" or the "override member." Rather, CWS improperly seeks to import specific structure (*i.e.*, "release pin") and functionality (*i.e.*, "moves . . . holding . . . in place") from the specification. CWS seeks to construe these two terms by how they purportedly function with unclaimed components rather than providing a construction for the meaning of "override assembly" or "override member." There is no legal basis supporting CWS's claim construction positions.

In all events, Evolve submits there is nothing ambiguous about "override assembly" or "override member." The terms have meanings that are common, which are apparent to even a lay person. *See, e.g.*, *Phillips*, 415 F.3d 1303. Providing a further construction would only result in "an obligatory exercise in redundancy," *see*

*U.S. Surgical Corp.*, 103 F.3d at 1568, that will not help, and may confuse, the jury.

If, *arguendo*, the Court believes some clarification is needed, Evolve proposes, for "override assembly," "parts that are configured to collectively function to override." As detailed above with respect to "flow control assembly," the specification indicates that an assembly is multiple parts or components. *See supra* IV.d; *see also* '417 Patent at 3:9-17. The specification goes into great detail of how many parts, many of which are specifically identified in various claims, are configured to override. *See, e.g.*, *id.* at 4:13-24, 5:4-39. Although the various parts described in the specification illustrate what can form an override assembly, Evolve was not required to claim all of those components. *See, e.g.*, *Golight, Inc.*, 355 F.3d at 1331; *Ventana Med. Sys.*, 473 F.3d at 1181. The specification is clear that the invention is not limited to those parts. *See, e.g.*, '417 Patent at 7:32-40. Additionally, this construction of "override assembly" is consistent with the construction Evolve has proposed for "control flow assembly." *See, e.g.*, *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("A court "presume[s], unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning."). If the Court determines any construction is needed other than plain and ordinary meaning, the Court should construe "override assembly" to be "parts that are configured to collectively function to override."

Turning to "override member," Evolve's proposal for "override member" is along the same lines as the construction for "override assembly," except to effectuate a difference between "member" and "assembly," which is "a part" versus "parts." *See, e.g.*, *Omega Eng'g*, 334 F.3d at 1334 ("A court "presume[s], unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning."); *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim."). This difference was address previously in the context of "flow control member." *See supra* § IV.d. Evolve submits that, to the extent a construction is

1  necessary, the Court should construe "override member" to be "a part that is

2  configured to function, alone or in combination, to override."

3  ### h.  "slide control assembly" – '417 Patent, claim 22

| Evolve's Construction | CWS's Construction |
|---|---|
| No construction needed. Plain and ordinary meaning.<br><br>In the alternative, "parts that are configured to collectively function to control a slide." | An assembly that moves the sliding sleeve into place and holds it. |

9  "Slide control assembly" assembly is only used in claim 22 of the '417 Patent.

10  The term "slide control assembly" is clear, and no further construction is necessary.

11  The claim recites, a "slide" and a "slide control assembly capable of unlockably

12  setting the slide in the second position." '417 Patent at 9:39-40. "[W]hen the slide is in

13  the second position," a piston engaging a temperature sensor is "configured to respond

14  to the temperature sensor so as to block the flow of water through the ports of the

15  slide." *Id.* at 9:33-38.

16  Reviewing CWS's proposed construction, there does not appear to be any

17  dispute over any ambiguity or scope of the terms. CWS does not appear to take issue

18  with "assembly," since CWS uses "assembly" in it construction. CWS does not appear

19  to construe "control," but appears to incorporate further functionality (*i.e.*, "moves . . .

20  into place and holds") into the concept of "control" beyond its plain and ordinary

21  meaning. Additionally, CWS appears to backdoor an ambiguous construction of

22  "slide" through construing "slide control assembly," instead of directly construing

23  "slide" as its own standalone term, which is recited in the claim.

24  Rather, Evolve submits there is nothing ambiguous about "slide control

25  assembly." The term has a meaning that is common, which is apparent to even a lay

26  person. *See, e.g.*, *Phillips*, 415 F.3d 1303. Providing a further construction would only

27  result in "an obligatory exercise in redundancy," *see U.S. Surgical Corp.*, 103 F.3d at

28  1568, that will not help, and may confuse, the jury.

If, *arguendo*, the Court believes some clarification is needed, Evolve proposes "parts that are configured to collectively function to control a slide." As detailed above with respect to "flow control assembly," the specification indicates that an assembly is multiple parts or components. *See supra* IV.d; *see also* '417 Patent at 3:9-17. The specification goes into great detail of how many parts, many of which are specifically identified in various claims, are configured to control a slide. *See, e.g.*, *id.* at '417 Patent at 4:13-42, 5:4-39. Although the various parts described in the specification illustrate what can form a slide control assembly, Evolve was not required to claim all of those components. *See, e.g.*, *Golight, Inc.*, 355 F.3d at 1331; *Ventana Med. Sys.*, 473 F.3d at 1181. The specification is clear that the invention is not limited to those parts. *See, e.g.*, '417 Patent at 7:32-40. Additionally, this construction of "slide control assembly" is consistent with the construction Evolve has proposed for "control flow assembly" and "override assembly." *See, e.g.*, *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("A court "presume[s], unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning."). If the Court determines any construction is needed other than plain and ordinary meaning, the Court should construe "slide control assembly" to be "parts that are configured to collectively function to control a slide."

## V.    CONCLUSION

For the above reasons, to the extent constructions of the above terms are necessary, Evolve submits that the Court should adopt Evolve's proposed constructions for terms.

1   RESPECTFULLY SUBMITTED this 30th day of November, 2018.

2

3                                     By: /s/ Jerry R. Selinger
                                          Nicholas Transier
4                                         Jerry Selinger (admitted *pro hac vice*)
                                          Patterson + Sheridan LLP
5                                         E-mail: ntransier@pattersonsheridan.com
6                                         E-mail: jselinger@pattersonsheridan.com

7

8                                         -   and   -

9
                                          James L. Williams (admitted *pro hac vice*)
10                                        SCHMITT SCHNECK
                                          CASEY EVEN & WILLIAMS, P.C.
11                                        E-mail: james@azbarristers.com
12                                        *Attorneys for Plaintiff*
                                          EVOLVE TECHNOLOGIES, LLC
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **CERTIFICATE OF SERVICE**

2

    I hereby certify that on November 30, 2018, I caused the attached document to

3

be electronically transmitted to the Clerk's Office using the CM/ECF System for

4

filing and service to the following CM/ECF registrants:

5

6

Stephen M. Lobbin
Austin J. Richardson
Joshua N. Osborn

7

**SML AVVOCATI P.C.**
888 Prospect Street, Suite 200

8

La Jolla, California 92037
Tel: 949.636.1391

9

sml@smlavvocati.com
ajr@smlavvocati,.com

10

jno@smlavvocati.com
*Attorneys for Defendant Coil Winding Specialist, Inc.*

11

12

/s/ Jerry R. Selinger

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28